DAIMLERCHRYSLER CORPORATION
v WESCO DISTRIBUTION, INC

Docket No. 276174. Submitted August 13, 2008, at Detroit. Decided
October 2, 2008, at 9:15 a.m. Leave to appeal sought.

DaimlerChrysler Corporation brought an action in the Wayne Circuit Court against Wesco Distribution, Inc., and High Voltage Maintenance Corporation, seeking contractual indemnification from Wesco for money DaimlerChrysler paid to Mark Stephens in settlement of a personal-injury action. Stephens had sustained injury at a DaimlerChrysler plant while inspecting electrical equipment that needed repair. Stephens was an engineer for Eaton Electrical Engineering and Services Division, which used Wesco as an intermediary to provide customers with price quotations for repair jobs and secure purchase orders for such jobs. After Stephens's injury, Wesco had submitted to DaimlerChrysler a quotation that included a provision for indemnification of Wesco by DaimlerChrysler for any loss arising out of the performance of the repair work. The purchase order DaimlerChrysler sent to Wesco to authorize the repair work included a contradictory provision calling for Wesco to indemnify DaimlerChrysler for any loss related to the repair work. The repair work was then completed. Wesco moved for summary disposition, but the trial court, Cynthia D. Stephens, instead granted summary disposition for DaimlerChrysler and ordered Wesco to indemnify Chrysler for the settlement amount, as well as for the related attorney fees and litigation expenses. Wesco appealed.

The Court of Appeals *held*:

1. DaimlerChrysler's purchase order, not Wesco's quotation, constituted the final agreement between those parties. By submitting the purchase order, DaimlerChrysler made a counteroffer, which Wesco accepted when the work was performed.

2. The trial court erred by ruling that the indemnity provision in DaimlerChrysler's purchase order applied to Stephens's injury, which occurred before the contract between Wesco and DaimlerChrysler was formed. An indemnification contract does not apply

retroactively unless the contracting parties expressly provide so in their contract. The contract in this case does not expressly provide for retroactive indemnification.

Reversed and remanded for entry of summary disposition for Wesco.

1. CONTRACTS — OFFER AND ACCEPTANCE — COUNTEROFFERS.

An acceptance must be in strict compliance with the offer in order for a contract to be formed; a material departure in an acceptance from the terms of an offer of services constitutes a counteroffer by the offeree, which the offeror can accept by performing the services.

2. INDEMNITY — CONTRACTUAL INDEMNIFICATION — RETROACTIVE APPLICATION OF INDEMNITY PROVISIONS.

An indemnification contract does not apply retroactively for loss before the contract's formation, unless the contracting parties expressly provide for retroactive indemnification in their contract.

*DeNardis, McCandless & Miller, P.C.* (by *William McCandless* and *Mark F. Miller*), for DaimlerChrysler Corporation.

*Strobl & Sharp, P.C.* (by *Alan C. Harnish*), and *John P. Jacobs, P.C.* (by *John P. Jacobs* and *Andrew T. Strahan*), for Wesco Distribution, Inc.

Before: MURRAY, P.J., and WHITBECK and TALBOT, JJ.

MURRAY, P.J. Defendant, Wesco Distribution, Inc., appeals as of right the trial court's order of judgment for plaintiff, DaimlerChrysler Corporation (Chrysler). Wesco's arguments on appeal pertain to the trial court's order granting summary disposition for Chrysler with respect to liability. Although Wesco posits several arguments for reversal, we find one dispositive. That is, Wesco could not be held liable to indemnify Chrysler under this contract for an injury that occurred before the contract was formed. On this basis, we reverse and remand.

I. FACTS AND PROCEEDINGS

Wesco, a distributor, has a business relationship with Eaton Electrical Engineering Services and Systems Division, which provides service and support to users of Eaton Electrical products and supports factories with warranties and other equipment needs. Eaton uses distributors like Wesco as intermediaries when performing electrical work for customers like Chrysler. In general, Eaton prepares a quotation for the work to be performed and submits it to Wesco. Wesco then applies a markup and supplies the quotation to the customer. If Wesco and Eaton are awarded the job, Wesco then receives a purchase order from the customer and sends it to Eaton, which performs the work.

On July 23, 2002, Jay Karnik and Jack Hemmert of Chrysler called Mark Stephens, a field services engineer for Eaton, and asked him to come to Chrysler's plant in Newark, Delaware, to look at some damaged electrical equipment contained in a capacitor bank and prepare a quotation for the work that would be required to repair it. When Stephens arrived at the plant, two or three High Voltage Maintenance Corporation (HVMC) employees were working on electrical equipment near the damaged capacitor bank. After Stephens finished gathering the information necessary to formulate a quotation for the repairs, Hemmert asked Stephens if he could borrow a phase rotation meter. Stephens retrieved the meter from his van and handed it to Hemmert. Stephens eventually sought to retrieve his meter. The Chrysler employees were about to use the meter, but one of them handed the meter to Stephens instead because it was "[his] device." One of the HVMC employees, who were standing next to Stephens, touched two of the leads to the transformer. Stephens

then touched the third lead to the transformer, and pushed the button. The equipment then exploded.

According to Dale Schmidt, a district manager for Eaton, Eaton was not able to use the information Stephens collected on that day because his notes were lost or destroyed during the accident. Schmidt and Jimi Jones, an Eaton employee responsible for direct sales, ultimately returned to the Delaware facility and "started from scratch," recollecting the information, and reformulating the quotation. In determining the extent of the damage, they "probably" also used some photographs that Stephens had taken of the equipment on July 23, 2002. The work of Schmidt and Jones resulted in an August 2, 2002, quotation from Eaton to Wesco, which Wesco used to formulate the quotation that it submitted to Chrysler, also on August 2, 2002. Wesco's quotation describes the work to be performed as "LABOR AND MATERIAL TO COMPLETE SERVICE WORK AND A 5KV METAL ENCLOSED CAPACITATOR BANK" and quotes the prices as $17,461, or $21,649 with optional overtime hours.

On August 8, 2002, Chrysler issued a purchase order to Wesco, which describes the work to be performed as follows: "PROVIDE ALL LABOR, MATERIAL AND SUPERVISION TO SERVICE, TROUBLE SHOOT AND REPAIR (1) 5KV, METAL ENCLOSED CAPACITATOR BANK." It also refers to Wesco's August 2, 2002, quotation, and lists the same $17,461 price. The purchase order includes an indemnification clause, which provides, in part: "Seller . . . shall protect, defend, hold harmless, and indemnify DaimlerChrysler from and against any and all loss . . . arising out of or related to the performance of any work in connection with this contract." On September 26, 2002, Wesco issued Chrysler an invoice, in the amount of $17,461,

for the repair of the capacitator bank, which Chrysler paid without objection on October 30, 2002.

In 2003, Stephens filed a personal injury action against Chrysler and HVMC in a Pennsylvania state court. Chrysler sought indemnification from Wesco and HVMC. They apparently refused, and Chrysler filed this action. As part of a settlement agreement between Stephens, HVMC, and Chrysler, Chrysler agreed to dismiss its claims against HVMC, and the trial court entered an order to that effect. Wesco filed a motion for summary disposition pursuant to MCR 2.116(C)(8) and (C)(10). The trial court, pursuant to MCR 2.116(I)(2), instead granted summary disposition for Chrysler with respect to liability, and thereafter entered judgment for Chrysler, awarding it $941,894.81, which included the $750,000 settlement that Chrysler paid to Stephens, attorney fees, litigation expenses, and prejudgment interest on those amounts.

## II. ANALYSIS

We review a trial court's decision on a motion for summary disposition de novo. *Rose v Nat'l Auction Group*, 466 Mich 453, 461; 646 NW2d 455 (2002). Although Wesco brought its motion for summary disposition under both MCR 2.116(C)(8) and (C)(10), the trial court decided the motion under MCR 2.116(C)(10) because it considered documentary evidence submitted by the parties. When reviewing a decision on a motion for summary disposition pursuant to MCR 2.116(C)(10), we consider "the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted by the parties in the light most favorable to the party opposing the motion." *Rose, supra* at 461. Summary disposition is appropriate "if there is no genuine issue regarding any material fact and the

moving party is entitled to judgment as a matter of law." In addition, under MCR 2.116(I)(2), summary disposition in favor of the opposing party is properly granted if the Court determines that that party, rather than the moving party, is entitled to judgment. MCR 2.116(I)(2); *Sharper Image Corp v Dep't of Treasury*, 216 Mich App 698, 701; 550 NW2d 596 (1996). We also review de novo, as questions of law, issues concerning the interpretation of a contract. *DaimlerChrysler Corp v G-Tech Professional Staffing, Inc*, 260 Mich App 183, 184-185; 678 NW2d 647 (2003).

Before addressing the indemnity issue, we first dispatch with Wesco's argument that the August 8, 2002, purchase order was not the final contract. Wesco bases much of its argument on an analysis of the parties' exchange of documents under the Uniform Commercial Code-Sales (UCC), MCL 440.2101 *et seq.* However, the UCC does not apply in this case because the primary purpose of the contract was the provision of services, rather than goods, and the UCC applies to transactions in goods. MCL 440.2102; *Neibarger v Universal Cooperatives, Inc*, 439 Mich 512, 536-537; 486 NW2d 612 (1992); *Farm Bureau Mut Ins Co v Combustion Research Corp*, 255 Mich App 715, 723; 662 NW2d 439 (2003). Here, Wesco's quotation of August 2, 2002, and Chrysler's August 8, 2002, purchase order make it clear that a service—repair of the capacitor bank—was the primary purpose of the parties' contract, and the provision of necessary materials was incidental to the repairs. Therefore, this contract dispute is governed by the common law, rather than the UCC.

Applying the common law, the trial court correctly held that the August 8, 2002, purchase order constituted a counteroffer, which Wesco accepted by its performance. "Before a contract can be completed, there

must be an offer and acceptance. Unless an acceptance is unambiguous and in strict conformance with the offer, no contract is formed." *Kloian v Domino's Pizza, LLC,* 273 Mich App 449, 452; 733 NW2d 766 (2006) (quotation marks and citation omitted.) "Further, a contract requires mutual assent or a meeting of the minds on all the essential terms." *Id.* at 453. Wesco's August 2, 2002, quotation provided:

> This quotation constitutes an offer to sell which offer expressly limits acceptance to the terms of this offer on the back of this quotation. This offer shall be firm for a period of fifteen (15) days from the date of this offer. Subject to Buyer's credit worthiness, the return of this form with a Purchase Order number or any other reasonable manner of acceptance will be sufficient to form an agreement on the terms and conditions on the back of or attached to this quotation.

"An offer is defined as the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Kloian, supra* at 453 (quotation marks and citation omitted). Wesco's quotation constituted an offer because it expressed Wesco's willingness to enter into an agreement and invited Chrysler's assent.

Chrysler responded with a purchase order that mirrors the key terms of Wesco's offer: listing the services to be performed, as well as the price, and referring to Wesco's quotation. However, the purchase order also states, "SELLER AGREES TO SELL AND DELIVER THE GOODS OR SERVICES IN ACCORDANCE WITH THE TERMS AND CONDITIONS CONTAINED IN THE ORDER." Clause # 054 of the purchase order, which requires Wesco to indemnify Chrysler, conflicts with a provision in Wesco's terms and conditions requiring Chrysler to indemnify Wesco.

Because an acceptance must be in strict compliance with the offer in order for an agreement to be formed, no contract was formed at this point. *Kloian, supra* at 452-453. Rather, Chrysler's purchase order constituted a rejection of Wesco's offer, and instead was a counteroffer. *Harper Bldg Co v Kaplan*, 332 Mich 651, 655; 52 NW2d 536 (1952); see also 2 Williston, Contracts (4th ed), § 6.11, pp 110-117 ("[B]ecause the offeror is entitled to receive what it is it has bargained for, if any provision is added to which the offeror did not assent, the consequence is not merely that the addition is not binding and that no contract is formed, but that the offer is rejected, and that the offeree's power of acceptance is thereafter terminated.").

Wesco accepted this counteroffer by performing the contract work. See *Sanchez v Eagle Alloy, Inc*, 254 Mich App 651, 666; 658 NW2d 510 (2003) ("A meeting of the minds can be found from performance and acquiescence in that performance."); Williston, § 6.25, pp 331-341, 350-357 (noting that the drafters of the Restatement Second take the position that, absent a contrary indication in the offer, the offeree will be entitled to accept either by promising to perform or by rendering performance). Therefore, Chrysler's August 8, 2002, purchase order constitutes the agreement between the parties. Wesco's subsequent issuance of an invoice containing different terms and conditions, despite its inclusion of a conditional assent clause, had no effect on the parties' preexisting agreement.[1]

Although the trial court correctly held that the August 8, 2002, purchase order constituted the contract, we believe it erred by ruling that the terms of the

---

[1] Wesco's reliance on *Power Press Sales Co v MSI Battle Creek Stamping*, 238 Mich App 173; 604 NW2d 772 (1999), is misplaced, as that case addressed issues under the UCC, which is inapplicable to this case.

indemnity clause of that contract applied to an act and injury occurring before August 8, 2002.

"This Court construes indemnity contracts in the same manner it construes contracts generally." *Badiee v Brighton Area Schools*, 265 Mich App 343, 351; 695 NW2d 521 (2005). "An unambiguous contract must be enforced according to its terms." *Id.* (quotation marks and citation omitted). "If indemnity contracts are ambiguous, the trier of fact must determine the intent of the parties." *Id.* "While it is true that indemnity contracts are construed strictly against the party who drafts them and against the indemnitee," *id.* at 352 (quotation marks and citation omitted), that principle only applies if the contract is ambiguous. *G-Tech Professional Staffing, Inc, supra* at 187. Whether a contract is ambiguous is a question of law for the court to decide. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007).

In arguing that the indemnification provision cannot be applied retroactively, Wesco correctly notes the general rule that a contract "cannot be construed to operate retrospectively," *In re Slack Estate*, 202 Mich App 627, 629; 509 NW2d 861 (1993), unless, of course, the parties expressly provide so in their agreement. See *Hyatt v The Grover & Baker Sewing Machine Co*, 41 Mich 225, 227; 1 NW 1037 (1879) (holding that surety contract would only apply prospectively unless the contract specified differently); *Brockway v Petted*, 79 Mich 620, 626; 45 NW 61 (1890) (surety contract only applies to future events unless otherwise provided in contract); *Watson Wyatt Corp v SBC Holdings, Inc*, 438 F Supp 2d 746, 750-751 (ED Mich, 2006) (applying Michigan law), rev'd in part on other grounds 513 F3d 646 (CA 6, 2008). These decisions are entirely consistent with the principle that it is the contract language

freely agreed to by the parties that controls. *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005). Thus, we again turn to the indemnity language chosen by the parties.[2]

The indemnification provision in Chrysler's purchase order provides, "Seller . . . shall protect, defend, hold harmless, and indemnify DaimlerChrysler from and against any and all loss . . . arising out of or related to the performance of any work in connection with this contract." This plain and unambiguous language makes clear that indemnification applies only to any loss that is related to work performed in connection with the August 8, 2002, contract. That contract required labor and material to be supplied for repair of the capacitor bank, and all of that work was started and completed after August 8, 2002. Obviously, the Stephens injury occurred well before the contract was formed (indeed, even before an offer was even made), and was not related to the work performed on the capacitor bank. Consequently, Stephens's injury was not covered by the indemnity clause.

DaimlerChrysler relies on *G-Tech Professional Staffing, Inc, supra,* as well as several unpublished, non-precedental decisions,[3] in support of its argument that the indemnity clause covered Stephens's precontract injury. But all *G-Tech* recognized is that the words

---

[2] Although neither relevant nor necessary to our decision under Michigan law, we note in passing that the rule in Michigan is consistent with that in several other states. See, e.g., *Pena v Chateau Woodmere Corp*, 304 AD2d 442, 443-444; 759 NYS 2d 451 (2003) (indemnity provision does not apply to injury that occurred before effective date of contract unless explicitly stated); *Service Merchandise Co v Hunter Fan Co*, 274 Ga App 290, 296-297; 617 SE2d 235 (2005) (same conclusion under Georgia law), and *Servco Pacific Inc v Dods*, 193 F Supp 2d 1183, 1193 (D Hawaii, 2002) (Hawaiian law).

[3] See MCR 7.215(C)(1).

"related" and "connecting" within an indemnity provision required an expansive reading of what was "related" or "connected" to the work performed under the contract. See *G-Tech Professional Staffing Inc, supra* at 186-187.[4] That conclusion, however, does not assist us in resolving the issue presented here. It is one thing to decide whether an injury occurring *during* the term of the contract falls within the contract's coverage language, but it is quite another to decide whether a party has agreed to indemnify another for an injury that occurred *before* the indemnity provision was agreed upon. Hence, unlike in *G-Tech*, where the Court was addressing whether a postcontract injury was related to the work performed under the contract, we must look to whether the parties provided language that shows an intent to require indemnification for *precontract* activity. As we have explained, there is no such language, and Stephen's precontract injury is not covered by the indemnity provision.

Reversed and remanded for entry of a judgment in favor of Wesco. We do not retain jurisdiction.

---

[4] We also point out that the injury caused in *G-Tech* occurred after formation of the contract. See *id.* at 187.